1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                        **DISTRICT OF NEVADA**

10                              \* \* \*

11

12 | THE WILDERNESS SOCIETY; GREAT OLD )     Case No.: 3:07-cv-00170-RLH-RAM
   | BROADS FOR WILDERNESS, )

13 |             Plaintiffs, )        **O R D E R**

THE WILDERNESS SOCIETY; GREAT OLD )
BROADS FOR WILDERNESS, )
                                   )                    Case No.: 3:07-cv-00170-RLH-RAM
                 Plaintiffs,       )
                                   )                         **O R D E R**
         vs.                       )
                                   )              (Motion for Summary Judgment–#49;
UNITED STATES FOREST SERVICE,      )              Motion for Summary Judgment–#80)
ABIGAIL KIMBELL, Chief of the United )
States Forest Service; MIKE JOHANNS, )
Secretary of Agriculture; EDWARD MONNIG, )
Humboldt-Toiyabe National Forest Supervisor; )
JACK TROYER, Intermountain Regional )
Forester,                          )
                                   )
                 Defendants.       )
_____)

21          Before the Court is Plaintiffs Great Old Broads for Wilderness ("Great Old

22 Broads") and The Wilderness Society's (collectively, "Plaintiffs") **Motion for Summary**

23 **Judgment** (#49), filed August 21, 2008.  The Court has also considered Defendant United States

24 Forest Service, Abigail Kimbell, Mike Johanns, Edward Monnig, and Jack Troyer's (collectively,

25 "the Forest Service") Opposition (#81), filed November 17, 2010, and Plaintiffs' Reply (#86), filed

26 February 15, 2011.

1    Also before the Court is the Forest Service's **Motion for Summary Judgment**

2    (#80), filed November 17, 2010.  The Court has also considered Plaintiffs' Opposition (#87), filed

3    February 15, 2011, and the Forest Service's Reply (#88), filed March 9, 2011.

4                                    **BACKGROUND**[1]

5    This dispute is rooted in the 1995 flooding that destroyed a road near Jarbidge,

6    Nevada, that extends into the South Canyon toward the Jarbidge Wilderness ("Jarbidge South

7    Canyon Road" or "South Canyon Road").[2]  Plaintiffs, two environmental conservationist groups,

8    appeal the Forest Service's 2005 decision to rebuild the washed-out Jarbidge South Canyon Road

9    in the Humboldt-Toiyabe National Forest alleging that the Forest Service did not abide all of the

10   procedural requirements required by statute and because of the potentially adverse effects to the

11   Jarbidge population of bull trout, a threatened species under the Endangered Species Act.

12   This case is related to another lawsuit, also before this Court, *United States v.*

13   *Carpenter*, No. 3:99-cv-547-RLH-RAM.  There, the Forest Service initiated proceedings against

14   John Carpenter and others to prevent them from rebuilding the Jarbidge South Canyon Road after

15   the flood washed it out.  The United States argued that Carpenter's acts to rebuild the road

16   amounted to trespass and violated the Endangered Species Act.  The Court joined Elko County to

17   the case because the road is located in Elko.  After months of mediation and attempts to settle the

18   matter, the parties entered into a settlement agreement.  At that time, The Wilderness Society and

19   the Great Old Broads sought to intervene and challenge the settlement agreement.  Since that time,

20

21       [1] The Court adopts the Parties' citation method for this order.  As this is a review of an administrative

22   decision, rather than repeatedly naming documents, the Court will simply cite to the administrative record, filed
     at Dkt. #20, as "AR ____." and to the subsequently filed additions to the administrative record, filed at Dkt. ##34

23   and 38, as "AR A____."  Excerpts from the original filing are also attached to Plaintiffs' Motion as Exhibit 3,
     and excerpts from the subsequent filings are attached as Exhibit 4.  Also, the Court will cite to the final

24   environmental impact statement as "FEIS ____."  Excerpts from the FEIS are attached to Plaintiffs' Motion as
     Exhibit 2, and the entire FEIS is part of the record at (Dkt. #20).

25       [2] For a more complete background on the Jarbidge South Canyon Road dispute, please see this Court's

26   Decision (Dkt. #296, Sept. 19, 2006) in the related case *United States v. Carpenter*, No. 3:99-cv-547-RLH-RAM
     (D. Nev. 2006).

AO 72
(Rev. 8/82)

1   the *Carpenter* case has been appealed and reappealed and is still outstanding before this Court

2   with The Wilderness Society and the Great Old Broads seeking to prevent the Forest Service and

3   Elko County from entering into their proposed settlement agreement.

4   In this suit, Plaintiffs challenge the Forest Service's actions related to rebuilding the

5   Jarbidge South Canyon Road.  Plaintiffs argue that the Forest Service's Final Environmental

6   Impact Statement ("FEIS") and 2005 Record of Decision ("2005 Decision") are deficient under the

7   law and should be vacated under the Administrative Procedure Act ("APA").  Now, the parties

8   have brought competing motions for summary judgment.  For the reasons discussed below, the

9   Court denies Plaintiffs' motion and grants the Forest Service's motion.

10   **DISCUSSION**

11   **I.    Legal Standards**

12   **A.    Summary Judgment Standard**

13   The Ninth Circuit uses motions for summary judgment under Federal Rule of Civil

14   Procedure 56 to review agency administrative decisions, under the limitations imposed by the

15   Administrative Procedure Act ("APA").  *See, e.g., Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,

16   18 F.3d 1468, 1471–72 (9th Cir. 1994) (discussing the standards of review under both the APA

17   and the Fed. R. Civ. P. 56).  Pursuant to Rule 56, "[t]he moving party is entitled to summary

18   judgment as a matter of law where, viewing the evidence and the inferences arising therefrom in

19   favor of the nonmovant, there are no genuine issues of material fact in dispute."  *Id.* at 1472.

20   However, because the a district court's role under the APA is not to find facts, but is limited to

21   reviewing the administrative record to determine whether the federal agency considered the

22   relevant factors and reached conclusions that were not arbitrary or capricious, there can be no

23   genuine issue of material fact, and summary judgment is the appropriate process to resolve the

24   dispute.  *See, e.g., Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985).

25   /

26   /

AO 72
(Rev. 8/82)

1        **B.       Administrative Procedure Act Standard**

2                Challenges to a federal agency's compliance with the National Forest Management

3    Act (the "Management Act"), National Environmental Policy Act ("NEPA"), and Executive Order

4    11988 are reviewed under the APA, 5 U.S.C. § 701 *et. seq. Lands Council v. McNair*, 537 F.3d

5    981, 987 (9th Cir. 2008) (en banc).  Under the APA, a court may overturn a federal agency's

6    decision only if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in

7    accordance with law." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891–92 (9th Cir.

8    2002) (quoting 5 U.S.C. § 706(2)(A)).  This is a deferential standard under which an agency's

9    decision "will only be overturned if the agency committed a 'clear error in judgment.'" *Wetlands*

10   *Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1114–15) (9th Cir. 2000) (quoting

11   *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1536 (9th Cir. 1997)).

12               Courts do not overturn agency actions merely because they disagree with the

13   agency's decision or even with its conclusions about the scope, breadth, or effect of environmental

14   impacts. *See, e.g.*, *Vt. Yankee Nuclear Power Corp. v. Nat'l Res. Defense Council*, 435 U.S. 519,

15   553, 558 (1978).  A court's task is simply "to insure a fully informed and well-considered

16   decision, not necessarily the decision the [court] would have reached" on its own. *Id.* at 558.  The

17   agency's decision only needs to be a rationally connected or reasonable decision, "not the best or

18   most reasonable decision." *Nat'l Wildlife Fed. v. Buford*, 871 F.2d 849, 855 (9th Cir. 1989).  In

19   other words, the Court will not substitute its own judgment for that of the agency. *See McNair*,

20   537 F.3d at 987.

21               Agencies are accorded particular deference with respect to scientific questions

22   within the agency's expertise. *McNair*, 537 F.3d at 993.  "When specialists express conflicting

23   views, an agency must have discretion to rely on the reasonable opinion of its own qualified

24   experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh*

25   *v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).  Neither is a court required to weigh

26   conflicting expert opinions or consider whether the agency employed the best scientific methods

1   available, only that the "procedure followed by the [agency] resulted in a reasoned analysis . . . ."

2   *Friends of Endangered Species v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985).

3   **II.    Analysis**

4          **A.    Exhaustion**

5                  The Forest Service argues and the Court concludes that Plaintiffs failed to exhaust

6   their administrative remedies.  Specifically, Plaintiffs failed to adequately appeal the Forest

7   Service's 2005 Decision.  "The Administrative Procedure Act requires that plaintiffs exhaust

8   available administrative remedies before bringing their grievances to federal court." *Idaho*

9   *Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002) (citing 5 U.S.C. § 704).

10   Forest Service statutes and regulations also require administrative exhaustion.  *Id.* (citing 7 U.S.C.

11   § 6912(e) and 36 C.F.R. § 215.20).  "The rationale underlying the exhaustion requirement is to

12   avoid premature claims and to ensure that the agency possessed of the most expertise in an area be

13   given first shot at resolving a claimant's difficulties." *Id.* (citing *Saulsbury Orchards & Almond*

14   *Processing, Inc. v. Yeutter*, 917 F.2d 1190, 1195 (9th Cir. 1990)).   The Ninth Circuit has held that

15   parties appealing administrative decisions may raise their issues in general terms, "rather than

16   precise legal formulations." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 899–900 (9th

17   Cir. 2002).  However, claims must be raised with sufficient clarity to allow the agency to

18   understand and rule on the issue raised, but there is no bright-line standard as to when this

19   requirement has been met and courts must consider exhaustion issues on a case-by-case basis.

20   *Rittenhouse*, 305 F.3d at 965 (citing *Native Ecosystems Council*, 304 F.3d at 900).

21          **1.    Appeal Requirements**

22                  Forest Service regulations set out certain minimum requirements for administrative

23   appeals that must be filed in writing with the Appeal Deciding Office.  Each of these nine

24   requirements must be met.  Here, the first five requirements are not in issue and so the Court will

25   not discuss them.  However, the Court will address each of the remaining requirements in turn.

26   /

### a.     Requirement 6

Forest Service regulations require appellants to describe "[a]ny specific change(s) in the decision that the appellant seeks and rationale for those changes." 36 C.F.R. § 215.14(b)(6). Plaintiffs clearly stated in their appeal letter that they wished the Forest Service to implement Alternative 2A, the equestrian and foot path, meeting the first part of requirement six.  However, Plaintiffs' only rationale in their actual appeal letter was that the 2005 Decision was wrong and contrary to law.  Plaintiffs do not reference any regulation or case law that the 2005 Decision purportedly violated or any other reason why the decision was contrary to law.  This isn't a rationale then but a claim, which simply regurgitates the legal standard.  Therefore, Plaintiffs did not meet requirement six.

### b.     Requirement 7

The regulations also require appellants describe "[a]ny portion(s) of the decision with which the appellant disagrees, and explanation for the disagreement." 36 C.F.R. § 215.14(b)(7).  It appears that Plaintiffs dispute the entirety of the decision in their appeal.  At the very least, Plaintiffs dispute the conclusion.  Although this could have been explained with greater clarity, Plaintiffs' appeal likely met this requirement.  However, because Plaintiffs do not meet all of the other requirements, the Court will not further address this one.

### c.     Requirement 8

The regulations also require appellants describe "[w]hy the appellant believes the Responsible Official's decision failed to consider the substantive comments." 36 C.F.R. § 215.14(b)(8).  Plaintiffs did nothing to explain why they believed the decision failed to consider their substantive comments in their appeal letter as the regulation requires.  Plaintiffs merely stated that the decision did "not resolve the concerns stated in Appellants' comment letters." (AR 11185.)  First, the Forest Service does not need to resolve the concerns, merely consider them.  36 C.F.R. § 215.14(b)(8).  Second, such a statement does not explain why Plaintiffs believed their

AO 72
(Rev. 8/82)

1   comments were not considered as requirement eight plainly requires.  Therefore, Plaintiffs did not

2   meet requirement eight.

3               **d.      Requirement 9**

4               Finally, the regulations require appellants detail "[h]ow the appellant believes the

5   decision specifically violates law, regulation, or policy."  36 C.F.R. § 215.14(b)(9).  Nothing in the

6   appeal letter describes how or why Plaintiffs believed the decision contravened the law, regulation,

7   or policy so as to exhaust Plaintiffs administrative remedies.  Instead, Plaintiffs merely state the

8   legal standard ("arbitrary, capricious, and fails to comply with applicable law") and tell the Forest

9   Service to review the attached comment letters to see why the decision fails to meet the standard.

10  The Court finds this statement simply insufficient as a matter of law.  The letter does not cite to

11  particular sections of the comment letters, does not describe which arguments in the comment

12  letters Plaintiffs rely on, or in any other way direct the Forest Service in how to address the

13  comment letters which contained a multitude of arguments, many or which were irrelevant to the

14  2005 Decision.  Plaintiffs essentially (and impermissibly) told the Forest Service to piece together

15  the appeal for themselves rather than specifically setting forth the grounds for appeal as they

16  should have.  This does not satisfy the minimal specificity and clarity requirements for an

17  administrative appeal of the Forest Service's decision.

18              This conclusion is buttressed by Plaintiffs letter dated July 5, 2005 ("July 5

19  Letter").  In that letter, Plaintiffs provided a list of reasons why the decision was arbitrary,

20  capricious, or contrary to law for the first time.  (AR 11222–23.)  However, Plaintiffs submitted

21  the July 5 Letter weeks after the deadline for submissions and supplementation.  36 C.F.R. §

22  215.15(a), (d).  Although Plaintiffs contend that the July 5 Letter was meant merely to aid the

23  Forest Service in considering the appeal and start a dialogue with the Forest Service, the Court

24  finds that the July 5 Letter was a belated attempt to meet the appeal requirements not met in the

25  original appeal submission.

26  /

AO 72
(Rev. 8/82)

1    Further, the appeal does not meet requirement nine, at least in part, because the

2    attached comment letters address the draft EIS rather than the actual 2005 Decision.  In the 2005

3    Decision, the Forest Service decided to use a combination of different alternatives presented in the

4    FEIS and the draft EIS (specifically, alternatives 1, 3, and 4), supposedly to take the best

5    environmental elements of the various plans to provide the best overall resolution to the situation.

6    The comment letters, however, only addressed the original alternatives presented in the draft EIS.

7    Therefore, while particular arguments against the various alternatives are applicable in contesting

8    the 2005 Decision, the Plaintiffs did not, and could not have, addressed the actual decision in their

9    pre-2005 Decision comment letters because that exact alternative did not yet exist when Plaintiffs

10   created the comment letters.  *See* 36 C.F.R. § 215.14(a) ("It is appellant's responsibility to provide

11   sufficient project–or activity–specific evidence and rationale, *focusing on the decision*, to show

12   why the Responsible official's *decision* should be reversed.") (emphasis added).  This would not

13   likely have been a problem had Plaintiffs initiated their appeal with something like the July 5

14   Letter wherein Plaintiffs gave specific reasons for contesting the 2005 Decision and cited to

15   specific comment letters with pin cites for further explanation of their arguments.  As is, Plaintiffs

16   gave no explanation as to what exactly they were appealing when they initially appealed and the

17   attached comment letters did not actually address the final decision.

18                    **2.    Plaintiffs' Tacit Acknowledgment of Appeal's Insufficiency**

19                   Finally, the appeal letter included other statements showing that not even Plaintiffs

20   considered the original appeal letter sufficient.  The appeal letter contained a footnote stating "If

21   Elko files an appeal, Appellants will submit an amended appeal addressing the grounds for their

22   appeal with more specificity."  (AR 11185.)  In other words, Plaintiffs planned to supplement their

23   appeal with the requisite clarity if they chose to proceed with their appeal.  This footnote alone

24   may not be sufficient to show Plaintiffs' knowledge that the appeal was insufficient.  However, the

25   appeal letter also states that "Appellants file this appeal to protect their rights to challenge the

26   decision."  When the Court examines the footnote in conjunction with this statement and considers

AO 72
(Rev. 8/82)

1    the paucity of the actual appeal letter, it is clear that the appeal was insufficient on its face.  This is

2    likely because Plaintiffs intended to either withdraw the appeal, as they stated in the appeal letter,

3    or supplement the appeal before the deadline passed if they chose to proceed with the appeal rather

4    than withdraw the appeal as then planned.

5            The Court's conclusion here is further supported by the July 5 letter.  In that letter,

6    Plaintiffs stated that they would not withdraw their appeal as previously planned and set out a list

7    of "some of the most significant reasons why the Forest Service's Decision is arbitrary, capricious,

8    and fails to comply with the applicable law."  (AR 11222.)  The Plaintiffs then, for the first time,

9    gave the reasons for their appeal and cited to the relevant portions of the comment letters that they

10   had previously submitted for explanatory argument.  When the Forest Service received this letter,

11   however, the Forest Service did not consider the letter because the time for supplementation or

12   appealing had passed.  While Plaintiffs attempt to argue that the comment letters attached to their

13   "appeal cover letter," (Dkt. #86, Opp'n 4), sufficed, the Court disagrees.  The Court recognizes

14   that the pleading standards in the administrative context are far more lax than the standards set

15   forth by the Federal Rules of Civil Procedure and does not compare the two.  However, merely

16   reference to attached documentation without even a modicum of citation to the documents or

17   explanation about what to look for, is insufficient.  An administrative agency cannot be expected

18   to traipse through attachments without even minimal guidance to figure out what exactly a party is

19   appealing.  It is the task of the appealing party to direct the agency, not the agency's job to guess as

20   to what the party is appealing and why.  For the foregoing reasons, the Court grants summary

21   judgment in favor of the Forest Service.

22          **B.     Merits**

23          Notwithstanding the previous analysis and conclusion, the Court is not ignorant to

24   the realities of these parties and these issues.  The Court recognizes that regardless of the Court's

25   decisions here, this case will most likely be appealed.  Therefore, the Court will also address the

26   merits of Plaintiffs' claims despite Plaintiffs' plain failure to exhaust administrative remedies.

AO 72
(Rev. 8/82)

1    Plaintiffs contend that the 2005 Decision is contrary to law for five reasons: (1) the

2    2005 Decision violates the National Forest Management Act ("Management Act"); (2) the 2005

3    Decision fails to comply with Executive Order 11988 by unnecessarily building on a flood plain;

4    (3) the Forest Service violated its own regulations by not closing the South Canyon to motor

5    vehicles, specifically all-terrain vehicles ("ATV"); (4) the Forest Service violated the National

6    Environmental Policy Act ("NEPA") by failing to adequately assess the environmental impact

7    from illegal ATV traffic; and (5) the Forest Service violated NEPA by failing to prepare a

8    supplemental NEPA analysis (a supplement to the FEIS) after adopting a significantly changed

9    alternative to the proposed alternatives analyzed in the FEIS.  After considering each of Plaintiffs'

10   arguments, the Court determines that it would also grant summary judgment in favor of the Forest

11   Service regardless of its conclusions based upon the exhaustion analysis .  The Court will address

12   each of Plaintiffs' arguments in turn.

13                    **1.      The National Forest Management Act - INFISH**

14   The Management Act requires the Forest Service to develop Land and Resource

15   Management Plans ("Forest Plans") for each national forest.  16 U.S.C. § 1604(a).  These plans

16   guide the Forest Service's decision making with regard to the national forests.  Once the Forest

17   Service adopts a Forest Plan, the Forest Plan controls decision making for that forest.  16 U.S.C. §

18   1604(i); *Lands Council v. Powell*, 395 F.3d 1019, 1032–33 (9th Cir. 2005).  Courts review

19   compliance with the Management Act and these Forest Plans under the APA arbitrary and

20   capricious, abuse of discretion, or not in accordance with law standard.  *Pit River Tribe v. U.S.*

21   *Forest Service*, 469 F.3d 769, 778 (9th Cir. 2006).

22   The Humboldt Forest Plan, which guides decisions in the South Canyon,

23   incorporates a region-wide Forest Service program known as the Inland Native Fish Strategy or

24   "INFISH."  (AR 1807.)  Under INFISH, the Forest Service designated the Jarbidge Canyon as a

25   "priority watershed" because of its importance to the surrounding population of bull trout.  This

26   /

1    "priority watershed" designation "require[s] the Forest Service to improve and protect watershed

2    conditions."  (AR 8152, 8358.)

3              Plaintiffs argue that the 2005 Decision violated INFISH guidelines and is, therefore,

4    contrary to law.  Plaintiffs argue that INFISH guideline FW-2 applies to the 2005 Decision.  FW-2

5    directs the Forest Service to relocate or close "facilities" in Riparian Habitat Conservation Areas

6    where the Forest Service must apply special management standards.  (FEIS at 3-153 to 3-154.)

7    Plaintiffs argue that the Forest Service didn't meet FW-2 because the 2005 Decision adversely

8    affects bull trout and because the new South Canyon Road will retard or prevent the South Canyon

9    from meeting the applicable Riparian Objectives.

10             To the contrary, the Forest Service argues that INFISH guideline FW-2 does not

11   apply to the 2005 Decision.  Instead, different road management standards apply, specifically the

12   "RF" standards.  The Forest Service argues that FW-2 applies to "fish and wildlife interpretive and

13   other user-enhancement facilities," (AR 1790), not to roads such as the South Canyon Road.

14   Plaintiffs argue that this is merely *post hoc* litigation rationalization, which is not allowed.  *See*

15   *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 50 (1983).  Plaintiffs are

16   incorrect because the Forest Service directly addressed the RF standards in the FEIS.  (*See* FEIS at

17   3-8 to 3-9.)

18             Here, the FEIS details the road management standards that the Forest Service felt

19   were applicable to the proposed alternatives.  The FEIS also discusses FW-2 and states that FW-2

20   applies to the design, construction, and operation of "fish and wildlife interpretive and other user-

21   enhancement facilities," not roads.  (FEIS 3-153.)

22             Plaintiffs rely on comments in the FEIS analysis of the individual alternatives for

23   their argument that the FW-2 standard applies rather than the RF standards.  The FEIS does state,

24   in regard to each of the three alternatives later combined to create the 2005 Decision, that the

25   alternatives did not meet FW-2.  (*See* FEIS 3-156, 3-161 to 3-162, and 3-164.)  The problem with

26   this conclusion is that the 2005 Decision did not need to meet FW-2 as to the South Canyon Road.

AO 72
(Rev. 8/82)

1    Additionally, the 2005 Decision, determined that the South Canyon Road would not violate

2    INFISH because the South Canyon Road complied with the RF standards, the standards that

3    actually applied to road management.  The FEIS may have been more clear, however a district

4    court will uphold an agency's decision even if the decision isn't the pinnacle of clarity as long as

5    the court can ascertain the agency's path.  *F.C.C. v. Fox Television Stations, Inc.*, - - U.S. - -, 129

6    S. Ct. 1800, 1810 (2009) (Courts "should 'uphold a decision of less than ideal clarity if the

7    agency's path may reasonably be discerned.'") (quoting *Bowman Transp., Inc. v. Arkansas-Best*

8    *Freight Sys., Inc.* 419 U.S. 281, 286 (1974)).

9           Here, it is clear to the Court that FW-2 does not apply to the disputed road, even

10   though FW-2 does appear to apply to the camp sites, water sources (such as drinking fountains, not

11   the river), and other user-enhancement facilities.  Therefore, the repeated FW-2 reference could be

12   because of continued existence of these facilities (some or all of which were removed under the

13   2005 Decision) under the relevant alternatives or simply to the apparent fact that these alternatives

14   would not have met this heightened standard, which would have been ideal though unnecessary.

15   The Court is uncertain as to why the FW-2 reference is included, but this simply does not matter

16   because the RF standards apply to roads such as the South Canyon Road, not FW-2.

17          Importantly, Plaintiffs do not even contend that the 2005 Decision fails to meet the

18   applicable RF standards.  Since the Court has determined that the relevant INFISH guidelines are

19   the RF standards, not the FW-2 standard applicable to user-enhancement facilities, the Plaintiffs

20   arguments regarding INFISH are without merit.

21          **2.      Executive Order 11988**

22          Plaintiffs contend that the 2005 Decision violates Executive Order 11988, 42 Fed.

23   Reg. 26951 (1977) ("EO 11988"), for three reasons: (1) locating the South Canyon Road in the

24   floodplain is not the only practicable alternative; (2) the Forest Service failed to minimize potential

25   harms to the floodplain; and (3) the Forest Service did not circulate the required notice explaining

26   why the proposed action was located in the floodplain.  Agency findings under EO 11988 are

AO 72
(Rev. 8/82)

1    reviewed under the APA arbitrary, capricious or abuse of discretion standard.   *City of Carmel-by-*
2    *the-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997).  The Court will analyze
3    each argument in turn.

### i.        No Practicable Alternative

5           EO 11988 prohibits federal projects within floodplains unless no practicable
6    alternatives exist.  EO 11988 § 2(a)(2); *Carmel-by-the-Sea*, 123 F.3d at 1166.  None of the parties
7    have defined 'practicable alternative' and the Court has not found a Forest Service definition of
8    'practicable alternative.'  However, the Court may take guidance from the Federal Highway
9    Administration definition described in *Carmel-by-the-Sea*.  The Federal Highway Administration
10   defines practicable alternatives under EO 11988 as "'capable of being done within reasonable
11   natural, social, or economic constraints.'" *Id.* at n.20 (quoting 23 C.F.R. § 650.105(k)
12   (implementing EO 11988)).  Here, the Forest Service examined various alternatives, including
13   some that Plaintiffs preferred.  Two of the alternatives that Plaintiffs prefer would have largely
14   avoided the floodplain, but would not have removed the road from the floodplain entirely.  (*See*
15   FEIS 2-13 through 2-15.)  However, the Forest Service exhaustively analyzed each of these
16   possible alternatives and made determinations as to which of the alternatives were practicable.
17   The Forest Service then selected the option it found was best overall and detailed its ruling in the
18   2005 Decision.  The Court concludes that this analysis in the FEIS and discussion in the 2005
19   Decision meet the requirements for a finding of no practicable alternative mandated by EO 11988.

20          Plaintiffs contend that the Forest Service considered two alternatives (alternatives 5
21   and 6) that would have routed the road outside of the floodplain and failed to determine that these
22   alternatives were impracticable.  Basically, Plaintiffs would require the Forest Service to make a
23   special and specific finding that "no practicable alternative existed" rather than simply
24   determining, after much consideration, that no practicable alternative existed.  Plaintiffs do not
25   point to such a requirement and the Court cannot find such a requirement within the text of the
26   executive order or within case law interpreting the executive order.  In *Carmel-by-the-Sea*, the

13

1    court addressed one such finding by an agency, but also acknowledged that impracticability could

2    be ascertained from the agency's general discussion of the alternatives even though the finding did

3    not explicitly address each alternative. *Id*. at n.21. Here, as in *Carmel-by-the-Sea*, the Court finds

4    that even though the agency did not expressly determine that the other alternatives were

5    impracticable, the Forest Service analyzed the alternatives sufficiently to show that other

6    alternatives were impracticable.

7            Plaintiffs further contend that all of the alternatives the Forest Service considered

8    had to have been practicable because by analyzing them the Forest Service considered them

9    "reasonable alternatives" since NEPA requires analysis of "all reasonable alternatives." 40 C.F.R.

10    § 1502.14. This argument is specious. Under such a theory, the Forest Service would have to

11    determine any impracticability before undertaking a NEPA analysis. However, it is logical that

12    agencies will sometimes know that an alternative that appeared reasonable is actually

13    impracticable only after the agency analyzes the alternative.

14                            **ii.    Minimizing Potential Harm**

15            After an agency has determined that building in a floodplain is the only practicable

16    alternative, EO 11988 requires the agency to "take steps to minimize potential damage to the

17    floodplain." *Carmel-by-the-Sea*, 123 F.3d at 1166. Plaintiffs argue that the Forest Service

18    decision does not minimize the potential harm to the floodplain. Plaintiffs assert that by

19    combining the three alternatives that had the greatest impact on the floodplain individually, the

20    2005 Decision must result in greater impact on the floodplain than any of the original alternatives.

21    Plaintiffs contend, therefore, that the Forest Service should have selected the footpath alternative

22    (Alternative 2a) to an actual road.

23            EO 11988 requires that an agency consider alternatives and "design or modify its

24    action" to minimize impacts on the floodplain; it does not require a different alternative. EO

25    11988 § 2(a)(2). This is precisely what the Forest Service did. (AR 11093–94 (discussing EO

26    11988).) The Forest Service considered and analyzed various possible alternatives. (*See* AR FEIS

AO 72
(Rev. 8/82)

3-80 to 3-101 (discussing floodplain concerns).)  The Forest Service then made decisions as to

practicability, benefit, etc.  Then the Forest Service *modified* the analyzed alternatives to limit the

impact on the floodplain.  (*See* AR 11083–86.)  Plaintiffs' argument that the impact of the

combined alternatives must add together (or multiply, Plaintiffs preferred mathematical formula is

unclear) to increase potential floodplain impact is, again, specious.  Although such a conclusion is

conceivable, it is not logical.  The Court agrees with the Forest Service that by modifying and

adjusting the different alternatives to take the environmentally friendly aspects, the Forest Service

could lessen the environmental impact (subtraction) rather than add to it.  *See Daingerfield Island*

*Protective Soc. v. Babbitt*, 40 F.3d 442, 447 (D.C. Cir. 1994) (holding that an agency complied

with EO 11988 where the agency acknowledged that its project would "be constructed in a '100

year floodplain' and affirmatively required design changes to ameliorate adverse effects on the

floodplain").  Therefore, the Forest Service's conclusion is not arbitrary and capricious, an abuse

of discretion, or contrary to law.

### iii.   Notice Requirement

Finally, EO 11988 requires the agency proposing action within a floodplain

"circulate a notice containing an explanation of why the action is proposed to be located within the

floodplain."  EO 11988 § 2(a)(2).  However, this notice must be presented in any required NEPA

documentation, *id.* at § 2(a)(1), here, the FEIS.  Plaintiffs do not dispute that the Forest Service

addressed EO 11988 in the FEIS, however, Plaintiffs contend that the Forest Service's treatment of

EO 11988 in the FEIS was insufficient to comply with EO 11988's notice requirement.  The Court

disagrees.

The Court finds that the Forest Service complied with EO 11988's notice

requirement.  The FEIS explains that the proposed action was "to authorize the *reestablishment* of

the South Canyon Road according to the proposal submitted by Elko County and described in this

document as Alternative 4."  (FEIS 1-1.)  The FEIS further explains that the need for the project

was to reestablish the South Canyon Road and limit further damage from "user-defined routes in

AO 72
(Rev. 8/82)

the riparian area and stream channel [that] has damaged the aquatic habitat and vegetation of the West Fork of the Jarbidge River." (FEIS 1-7 to 1-8.)  This was a proposal to rehabilitate a road that already existed within the floodplain, not to newly construct something within the floodplain. Since the project was about rehabilitating an existing road, this notice easily meets EO 11988's notice requirement and explained why the proposal was within the floodplain.  The proposed action was within the floodplain, quite simply, because the South Canyon Road was already there.

### 3.    Closing the Road to ATV and Other Traffic

Plaintiffs argue that Forest Service regulations required the Forest Service to close the South Canyon, not just the road, to motorized traffic because the agency recognized that off-road traffic was causing "considerable adverse impacts."  36 C.F.R. §§ 295.5, 295.2(a) (2004). Plaintiffs argue that this regulation left the Forest Service no option but to close the South Canyon. The Forest Service, however, contends that it maintains discretion to implement myriad different solutions to fix problems due to motorized traffic.  *See Forest Service Handbook* § 2509.22 (providing various options to limit site degradation).  Further, the Forest Service points out that all of the adverse affects Plaintiffs discuss occurred during the time that the South Canyon Road was washed out and that the Forest Service has closed off the South Canyon above Urdahl to motorized traffic.

The Court concludes that the Forest Service acted within its discretion.  First, the ATV problem appears to have been caused by the lack of a road in the South Canyon.  It is only logical that by repairing the road, the Forest Service would ameliorate the problem.  Further, the other illegal activity surrounding the South Canyon Road (such as road reconstruction activity) was in an attempt to reopen the road.  It is well within the bounds of reason, and agency discretion, to conclude that reopening the road would end this activity.  Finally, the Forest Service acted to close off the portion of the South Canyon that the Forest Service was most concerned about by placing large boulders and other impediments to block access.  (Dkt. #86, Pl. Resp. Ex. 12 at 10895.)  The closure regulation requires the Forest Service to close off an area when the Forest

1   Service is concerned about "considerable adverse impacts," not when conservation groups become

2   concerned.  36 C.F.R. § 295.5, 295.2(a) (2004).  The Forest Service's conclusions and actions

3   were reasonable and well within the Forest Service's discretion and lawful authority.

4   **4.     Failure to Assess Impact of Illegal, Off-Road ATV Traffic**

5                Plaintiffs also contend that the Forest Service violated NEPA by failing to

6   "consider an important aspect of the problem," (*Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*

7   *Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)), when the agency issued the 2005 Decision without

8   analyzing the effects of illegal ATV use within the South Canyon and the Jarbidge Wilderness

9   Area.   Agencies must take a "hard look" at environmental impacts of proposed actions.

10  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  This "hard look"

11  includes analyzing the effects of legal or illegal activity that is likely to occur and bears on project

12  alternatives.  *See Found. for N. Am. Wild Sheep v. U.S. Dep't of Agric.*, 681 F.2d 1172 1178 (9th

13  Cir. 1982) ("*Wild Sheep*") (holding that the Forest Service had failed to adequately analyze the

14  effects of unauthorized vehicular activity that the agency assumed was likely to occur).  Plaintiffs

15  argue that the Forest Service did not engage in the requisite "hard look" because the agency

16  ignored evidence of damage from illegal traffic, impermissibly assuming that people would follow

17  the law despite contradictory evidence.

18               A key difference between this case and the situation at issue in *Wild Sheep* is that in

19  *Wild Sheep* the Forest Service assumed that there would be illegal traffic on the proposed road,

20  whereas the Forest Service made no such assumption or finding in this case.  Here, Plaintiffs

21  presume illegal activities, not the Forest Service.  Now, the Court fully acknowledges that past

22  behavior is a good indicator of future behavior.  However, as discussed above, all of Plaintiffs'

23  evidence of ATV damage and abuse comes from the period after 1995, *i.e.* after the flood washed

24  out the South Canyon Road.  This is not evidence that such activity would continue after the road

25  was rebuilt.  In fact, the Forest Service could logically conclude that once the road was rebuilt,

26  such illicit traffic would no longer be a problem since there is no evidence to show that these

17

1   problems existed when the road was still intact.  Therefore, this conclusion is more than a "'mere

2   listing' of good management practices," *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1151

3   (9th Cir. 1998), but a rational conclusion about the circumstances at hand.  Quite simply, the FEIS

4   "contains a reasonably thorough discussion of the significant aspects of the probable

5   environmental consequences," as required.  *Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 492

6   (9th Cir. 1987) (internal quotations omitted).  The other cases that Plaintiffs cite simply do not

7   deal with analogous situations.[3]

8                    **5.      Supplemental Environmental Impact Statement**

9               Finally, Plaintiffs contend that the Forest Service violated NEPA by failing to

10   prepare a supplemental environmental impact statement after adopting a previously unconsidered

11   alternative.  Under NEPA's implementing regulations, a federal agency has a duty to prepare and

12   circulate a Supplement if the agency "makes substantial changes in the proposed action that are

13   relevant to environmental concerns."  40 C.F.R. § 1502.9(c)(1)(i).  If an agency makes changes to

14   its proposed project, it must evaluate whether those changes are significant and thus require a

15   supplement.  *Idaho Sporting Congress, Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000)

16   (*overruled on other grounds by McNair*, 537 F.3d at 997).  An agency's decision not to

17   supplement an FEIS is reviewed under the APA "arbitrary and capricious" standard.  *Marsh*, 490

18   U.S. at 375–76.  Therefore, the Court must determine whether the Forest Service erred by not

19   preparing and issuing a Supplement.

20               The Court concludes that the agency properly determined that it did not need to

21   prepare and circulate a supplement.  As the Supreme Court has stated, "an agency need not

22   supplement an EIS every time new information comes to light after the EIS is finalized.  To

23   require otherwise would render agency decision making intractable, always awaiting updated

24   information only to find the new information outdated by the time a decision is made."  *Marsh*,

25   _____

26        [3] Plaintiffs also exaggerate the frequency and severity of off-road ATV use by referring to one particular
incident as if it were four different incidents.

AO 72
(Rev. 8/82)

490 U.S. at 373.  Plaintiffs contend that the Forest Service adopted an alternative that the Forest Service had never previously examined.  However, the Forest Service acted within its discretion in concluding that the adopted alternative does not "present a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned." *Sierra Club v. Froehlke* 816 F.2d 205, 210 (5th Cir. 1987) (emphasis in original).  The adopted alternative, instead, merely combines certain *fully analyzed* aspects of three different alternatives presented in the FEIS.  Although the Court can conceive of situations where an agency merely combines aspects from analyzed alternatives and yet a supplement may be necessary, such situations seem like anomalies.  Here, the Forest Service adequately analyzed the environmental impacts of the 2005 Decision in the FEIS and no *seriously* different picture of the environmental impact emerged.  Therefore the Forest Service did not err by not creating a Supplement.

After examination, the Court concludes that each of Plaintiffs' arguments lacks merit.  The Forest Service's decision was not arbitrary and capricious, an abuse of discretion, or contrary to law.  Therefore, the Court grants summary judgment in favor of the Forest Service.

## CONCLUSION

Accordingly, and for good cause appearing,

IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment (#49) is DENIED.

IT IS FURTHER ORDERED that the Forest Service's Motion for Summary Judgment (#80) is GRANTED.

Dated: March 17, 2011.

_____
**ROGER L. HUNT**
**Chief United States District Judge**

AO 72
(Rev. 8/82)