**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| GREAT OLD BROADS FOR WILDERNESS; THE WILDERNESS SOCIETY, <br> *Plaintiffs-Appellants*, <br><br> v. <br><br> ABIGAIL KIMBELL, Chief, United States Forest Service; MIKE JOHANNS, Secretary of Agriculture; EDWARD MONNING, Humboldt-Toiyabe National Forest Supervisor; JACK TROYER, Intermountain Regional Forester; UNITED STATES FOREST SERVICE; UNITED STATES OF AMERICA, <br> *Defendants-Appellees*. | No. 11-16183 <br><br> D.C. No. 3:07-cv-00170-RLH-RAM <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Nevada
Roger L. Hunt, Senior District Judge, Presiding

Argued and Submitted
November 6, 2012—San Francisco, California

Filed March 4, 2013

2   GREAT OLD BROADS FOR WILDERNESS v. KIMBELL

Before: Robert D. Sack,[*] Ronald M. Gould,
and Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Gould

---

**SUMMARY**[**]

---

### Environmental Law

The panel reversed in part and affirmed in part the district court's judgment in favor of the United States Forest Service in an action challenging the Forest Service's approval of the restoration of a flood-damaged road in the Humboldt-Toiyabe National Forest in Nevada.

The panel reversed the district court's holding on exhaustion, and held that each of the claims presented on appeal were adequately exhausted by plaintiff's submissions to the Forest Service. The panel affirmed the district court's alternative holding on the merits, granting summary judgment in favor of the Forest Service. The panel held that the Forest Service's Record of Decision conformed to the National Forest Management Act, Executive Order 11988, and the National Environmental Policy Act.

---

[*] The Honorable Robert D. Sack, Senior Circuit Judge for the U.S. Court of Appeals for the Second Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Alison Christine Flint (argued) and Michael Freeman, Earthjustice, Denver, Colorado; Craig Coleman, Faegre Baker Daniels LLP, Minneapolis, Minnesota; Henry Egghart, Attorney, Reno, Nevada, for Appellants.

Elizabeth Ann Peterson (argued), Environment & Natural Resources Division, Department of Justice, Washington, D.C.; Andrew A. Smith, Assistant United States Attorney, Albuquerque, New Mexico, for Appellees.

## OPINION

GOULD, Circuit Judge:

This case arises out of the long and contentious process to repair a flood-damaged road in a sensitive area of the Humboldt-Toiyabe National Forest in Elko County, Nevada. A related dispute reached us twice before, when we ordered that Appellants Great Old Broads and the Wilderness Society (collectively, "Great Old Broads") be allowed to intervene in court-directed settlement talks to determine how best to repair or replace the road, rejecting timeliness and standing challenges. *See United States v. Carpenter* (*Carpenter I*), 298 F.3d 1122, 1125 (9th Cir. 2002); *United States v. Carpenter* (*Carpenter II*), 526 F.3d 1237, 1240 (9th Cir. 2008). Great Old Broads now appeals the district court's grant of summary judgment to the United States Forest Service ("Forest Service") on Great Old Broads's claims related to the Forest Service's record of decision ("ROD") determining the method for restoring the South Canyon Road as a part of the Jarbidge Canyon Project (the "Project"). The

Project was an effort to reestablish the South Canyon Road after flood waters damaged the road in 1995, eliminating vehicle access to the Snowslide Gulch Wilderness Portal in the Jarbidge Wilderness. Great Old Broads sought review in federal court, contending that the Forest Service's approval of the Project violated (1) the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1687, because the Project offended the Fisheries and Wildlife Restoration standard FW-2 of the Inland Native Fish Strategy ("INFISH"), which is incorporated into the Humboldt National Forest Land and Resource Management Plan ("Humboldt Plan"); (2) Executive Order 11988, ("EO 11988"), 42 Fed. Reg. 26951 (1977); and (3) the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–4370f.

The district court gave summary judgment to the Forest Service, holding that Great Old Broads did not exhaust its administrative remedies and, alternatively, that Great Old Broads's claims failed on the merits. We have jurisdiction under 28 U.S.C. § 1291. We reverse the district court's conclusion on exhaustion and affirm its alternate decision on the merits.

## I. BACKGROUND

Jarbidge Canyon is in the northeast corner of Nevada, between Twin Falls, Idaho, and Elko, Nevada. The Jarbidge River flows north from the Jarbidge Wilderness into Idaho, where it joins the Bruneau River and eventually the Snake and Columbia Rivers. The Jarbidge River is home to the only population of bull trout known to exist south of the Snake River. This population has been isolated from other bull trout for more than 100 years by a combination of human and natural barriers.

The South Canyon Road (indexed as Forest Road # 064) follows the West Fork of the Jarbidge River through Jarbidge Canyon.  The road dates to 1909, when gold was discovered in the canyon, leading to one of the last gold rushes in the United States and spurring development of access roads throughout the canyon.  The disputed segment of the road was completed between 1911 and 1918.  In 1974, the road was closed above Snowslide Gulch because annual landslides made maintenance impractical.  Until 1995, the South Canyon Road gave the only motorized-vehicle access to the wilderness area at Snowslide Gulch.  The road climbs one mile from Pine Creek Campground to the Urdahl Concentrated Use Area ("Urdahl") and then another half mile to Snowslide Gulch.  In 1995, the Jarbidge River flooded, making this part of the South Canyon Road unpassable to passenger vehicles for at least the fifth time since 1970.

In 1997, the Forest Service prepared an environmental assessment and made a finding of no significant impact ("FONSI") for the recommended  repair of the entire South Canyon Road.  Trout Unlimited mounted an administrative challenge to this FONSI, arguing that the proposed reconstruction would harm the bull trout population and habitat, and suggesting that harm would lead to the trout's listing under the Endangered Species Act ("ESA").  The Regional Forester remanded the environmental assessment to the Forest Service to consider Trout Unlimited's claims.

In June 1998, the United States Fish and Wildlife Service ("FWS") proposed listing the Jarbidge River bull trout as a threatened species under the ESA.  At the same time, after receiving comments on its 1997 environmental assessment and conducting more analysis in response to Trout Unlimited's suit, the Forest Service published a second

environmental assessment. This 1998 environmental
assessment identified a hiking trail as the preferred
alternative, eliminating motorized access along the entire
relevant stretch of the South Canyon Road.

In response to this proposed ESA listing and the
recommendation of the 1998 environmental assessment, Elko
County unilaterally directed its road department to begin
repair of the South Canyon Road, citing its need to access the
South Canyon to fight forest fires. While rebuilding the road,
Elko County diverted the river into a straight channel. This
channelization lifted a plume of sediment that stretched 3.5
miles down the river and damaged the river bank. Elko
County's repair work was blocked by the Nevada Division of
Environmental Protection, but the repairs had so damaged the
river habitat that FWS issued an emergency listing of the
Jarbidge bull trout as endangered in August 1998.
Emergency Listing of the Jarbidge River Population Segment
of Bull Trout as Endangered, 63 Fed. Reg. 42757, August 11,
1998. Predicting that "impacts from the road reconstruction
to bull trout habitat will likely remain for years," FWS
permanently listed the bull trout as threatened on April 8,
1999. Endangered and Threatened Wildlife and Plants;
Determination of Threatened Status for the Jarbidge River
Population Segment of Bull Trout, 64 Fed. Reg. 17110, April
8, 1999.

The Forest Service and Elko County tried to negotiate a
plan to reopen the road over the next few months, but this
effort failed. Frustrated by lack of progress and determined
to enable vehicle access to the wilderness area, a local
citizens' group calling itself the "Shovel Brigade" decided to
reopen the road by hand. In October of 1999, District Judge
Hagen blocked the Brigade's plan to reopen the road and

required the Brigade, Elko County, and the Forest Service to enter confidential mediation. Off-road vehicle (ORV) riders continued to enter the South Canyon, undeterred by road conditions and the Forest Service's attempts to block access. These ORVs established trails along the length of the washed-out road and further damaged the river habitat.

After months of unsuccessful talks, the Shovel Brigade again made plans to reopen the road by hand. This time the Brigade styled its effort as a protest scheduled on July 4, 2000. The district court did not enjoin the Brigade from its plan, and the Brigade successfully opened a rudimentary, quarter-mile road. In response, the United States charged members of the Shovel Brigade with trespassing and renewed a suit against Elko County for damage caused by the County's earlier road work. Elko County entered a cross-claim to quiet title to a right of way in the South Canyon Road under Revised Statute 2477 (RS 2477).[1]

Judge Hagen again ordered the Forest Service, Elko County, and the Shovel Brigade (represented by named defendant John Carpenter) into confidential settlement talks. On March 2, 2001, the parties told the court that they had reached an agreement. *Carpenter I*, 298 F.3d at 1124. In the proposed settlement agreement ("Proposed Settlement"), (1)

---

[1] RS 2477 formerly provided that "the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." 43 U.S.C. § 932 (1970), *repealed by* Federal Land Policy Management Act ("FLPMA"), Pub. L. No. 94-579, § 706(a), 90 Stat. 2743, 2793 (1976). The FLPMA preserved rights-of-way that existed before 1976. 43 U.S.C. § 1769(a). Parties claiming RS 2477 easements must show the road on which their claim is based was built before the land it crosses lost its public character. *Humboldt County v. United States*, 684 F.2d 1276, 1281 (9th Cir. 1982).

the parties released all claims against each other; (2) the
Forest Service recognized Elko County's RS 2477 right of
way and agreed to allow the County to restore the South
Canyon Road; and (3) Elko County and Carpenter agreed that
the United States had authority to manage the land in accord
with federal environmental laws and promised to obtain
Forest Service authorization before performing any work on
the South Canyon Road.

At this point, the details of the Proposed Settlement were
publicized, and Great Old Broads moved to intervene as a
defendant in Elko County's Quiet Title Act claim. *Id.* Great
Old Broads claimed that the Proposed Settlement "improperly
ceded a property interest in the road to the County of Elko,
thereby substantially diminishing the environmental
protections for the adjacent wilderness areas." *Id.* The
district court rejected Great Old Broads's motion as untimely
and accepted the Proposed Settlement. *Id.* Great Old Broads
appealed. We vacated the approval of the Proposed
Settlement and ordered that Great Old Broads be allowed to
intervene. *Id.* at 1125.

Great Old Broads renewed its motion to intervene in the
district court on the Quiet Title Act claim and filed
Administrative Procedure Act ("APA") cross-claims against
the United States, challenging the settlement under NEPA,
the Federal Land Policy and Management Act, 43 U.S.C.
§ 1701 et seq., and Forest Service regulations, 36 C.F.R.
§ 251. *Carpenter II*, 526 F.3d at 1239. The district court
held that Great Old Broads lacked standing to challenge Elko
County's Quiet Title Act claim. *Id.* And although the district
court allowed Great Old Broads to intervene on its other
claims, it dismissed them on the ground that the Attorney
General's decision to settle was not reviewable under the

APA. *Id.* Nevertheless, the district court recognized that "the government circumvented certain procedural mandates imposed by Congress," so the district court stayed its approval until the United States demonstrated that the Proposed Settlement complied with the environmental statutes and regulations raised in Great Old Broads's cross-claims. *Id.* at 1239–40.

After entering this order, Judge Hagen retired, and Judge Hunt succeeded to judicial responsibility on the case. *Id.* at 1240; *see Wilderness Soc'y v. U.S. Forest Serv.*, 3:07-CV-00170-RLH, 2011 WL 1042612 (D. Nev. Mar. 17, 2011). Judge Hunt lifted the stay, relieving the government of its obligation to demonstrate that the Proposed Settlement did not violate the environmental laws identified by Great Old Broads. *Carpenter II*, 526 F.3d at 1240. After lifting the stay, Judge Hunt held hearings on the merits of the Proposed Settlement. *Id.* Great Old Broads was not permitted to present evidence or participate as a party. *Id.* After these hearings, the district court approved the Proposed Settlement, and Great Old Broads appealed. *Id.*

We again reversed the district court, holding that its ruling that Great Old Broads did not have standing to intervene in the Quiet Title Act claim was foreclosed by our earlier decision. *Id.* (citing *Carpenter I*, 298 F.3d at 1125–26). We further held that Great Old Broads's cross-claims were reviewable under the APA. *Id.* at 1241–42. We vacated the approval of the Quiet Title Act settlement and reversed the dismissal of Great Old Broads's cross-claims. *Id.* at 1243.

While Great Old Broads litigated its right to intervene, Elko County and the Forest Service worked to put the

Proposed Settlement into effect.  Elko County proposed a
plan to reestablish the road on August 16, 2002, as called for
by the Proposed Settlement.  In April 2003, the Forest Service
published a draft Environmental Impact Statement ("EIS"),
that analyzed the Elko County proposal,  and six other
management alternatives for the Project.  Great Old Broads
commented on the draft EIS.

In April 2005, the Forest Service issued a draft Record of
Decision ("ROD").  The draft ROD did not adopt any of the
alternatives analyzed in the draft EIS to form the management
alternative selected for the Project (the "Selected
Alternative").   Instead, the Selected Alternative was a
combination of elements from the following draft EIS
alternatives:

> **Alternative 1** (The No-Action Alternative)
> left the road in its condition as of early 2005,
> including the primitive restoration work
> performed by the Shovel Brigade and the
> routes defined by unauthorized users.

> **Alternative 3** restored the road up to Urdahl
> but replaced it with a hiking trail from there,
> providing non-motorized access to Snowslide
> Gulch.   Alternative 3 required the
> construction of two new bridges and several
> new road segments.

> **Alternative 4** (The Elko County Proposal)
> relocated the river and road to their 1995 pre-
> flood locations, providing passenger-vehicle
> access to Snowslide Gulch.

The Selected Alternative largely followed Alternative 4, restoring the road for the mile from Pine Creek Campground to Urdahl, but it incorporated the hiking trail analyzed in Alternative 3 from Urdahl to Snowslide Gulch. Alternative 3 reclaimed the road above Urdahl, so the Selected Alternative allowed only non-motorized access in the last half-mile to the wilderness area. The Selected Alternative also avoided river and road relocation and bridge construction in Alternatives 3 and 4 by replacing those features with low-water crossings from the user-defined routes in Alternative 1. The Selected Alternative did not recognize Elko County's claim to title in a right of way through the South Canyon.

The Selected Alternative incorporated no part of Great Old Broads's preferred alternative, Alternative 2, which would have replaced the road with a hiking trail from Pine Creek Campground to Snowslide Gulch, or Alternatives 5 and 6, which would have raised the road above the Jarbidge River floodplain. Alternative 7, like Alternative 1, contemplated no repairs to the road. It differed from Alternative 1 in that it included a Road Management Plan and Water Projects.

On April 13, 2005, Great Old Broads submitted a comment letter on the ROD. Great Old Broads wrote that the Selected Alternative represented a "substantial improvement" over Elko County's proposal, but Great Old Broads continued to object to any decision to reconstruct the South Canyon Road above Pine Creek Campground. Great Old Broads urged that the Forest Service adopt Alternative 2, which the Forest Service found would result in the lowest impacts from erosion and mass wasting events. Great Old Broads also argued that the Selected Alternative, unlike Alternative 2, was legally infirm for three reasons: (1) the Selected Alternative

"would not meet the INFISH standards that are incorporated into the [Humboldt Plan]"; (2) by rebuilding the South Canyon Road, the Selected Alternative "contravenes [EO 11988] because it does not avoid the Jarbidge River floodplain"; and (3) the Selected Alternative "represents a significant change that merits further environmental analysis."

The Forest Service issued the final ROD and final EIS at the end of April, adopting the Selected Alternative in a form essentially unchanged from the draft ROD. The final EIS analyzed the same seven alternatives considered in the draft EIS and did not add additional analysis of the Selected Alternative. The final ROD included a more detailed explanation of the Selected Alternative, and the Forest Supervisor explained that he "considered all views that have been expressed" and that "[t]hese comments have helped me make a better informed decision." Neither the ROD nor the final EIS attached or responded to Great Old Broads's comments in its April 13 letter.

On June 14, 2005, Great Old Broads filed an administrative appeal of the decision to approve the ROD and the final EIS "to protect [its] rights to challenge the decision" if Elko County were to appeal. In its appeal letter, Great Old Broads once again advocated the non-motorized trail considered as Alternative 2. Great Old Broads also contended that the Selected Alternative was arbitrary, capricious, and did not comply with applicable law "[f]or the reasons stated in the attached comment letters." Of seven attached letters, labeled Exhibits 1–7, the first five related to the draft EIS. Exhibit 6 was the April 13 letter on the draft ROD. Exhibit 7 commented on the draft biological opinion that coincided with the draft ROD.

On July 5, Great Old Broads told the Forest Service that it would not withdraw its appeal "[i]n light of the Shovel Brigade's administrative appeal, and Elko County's decision to re-commence litigation." *See United States v. Carpenter*, 3:99-CV-00547-RLH, 2012 WL 3686872 (D. Nev. Aug. 27, 2012). The July 5 letter set out fuller descriptions of the issues on which Great Old Broads contested the Selected Alternative and responded to arguments made by Elko County and the Shovel Brigade in their respective appeals. Great Old Broads characterized the decision to leave the road open from Pine Creek Campground to Urdahl as "an effort to compromise with Elko County, and thus resolve this dispute without further litigation." "In light of the intransigence of Elko County and the Shovel Brigade," Great Old Broads again urged the Forest Service to adopt a hiking trail as analyzed in Alternative 2. The Forest Service's Appeal Deciding Officer notified Great Old Broads that the July 5 letter was untimely and would not be considered. *See* 36 C.F.R. § 215.15 (appeal time periods for National Forest System Projects).

On July 21, 2005, the Forest Service denied Great Old Broads's appeal and affirmed the decision approving the ROD and final EIS. The Appeal Deciding Officer did not consider issues raised in the attachments because Great Old Broads's appeal letter did not explain how the initial decision had failed to consider substantive comments and did not identify the unconsidered aspects of the attached letters. Based on this limited review, the Appeal Deciding Officer held that the decision was "reasonable, based on documentation in the record and consistent with the [Humboldt] Plan."

Great Old Broads timely filed an action in the U.S. District Court for the District of Nevada seeking review of the Forest Service's actions. The district court granted the Forest Service's motion for summary judgment, holding that Great Old Broads did not exhaust its administrative remedies on any claim and that, in the alternative, Great Old Broads's claims failed on the merits. This appeal followed.

## II. STANDARD OF REVIEW

We review the district court's grant of summary judgment *de novo*. *Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1220 (9th Cir. 2011). Section 706 of the APA governs judicial review of agency decisions under the NFMA, NEPA, and EO 11988. 5 U.S.C. § 706; *see Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (applying arbitrary and capricious standard to NEPA and NFMA claims); *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997) (applying arbitrary and capricious standard to EO 11988 claims). We will not overturn agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004) (citations omitted). A reviewing court "generally must be 'at its most deferential' when reviewing scientific judgments and

technical analyses within the agency's expertise." *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1075 (9th Cir. 2011) (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)).

## III. DISCUSSION

### A. Exhaustion of Administrative Remedies

The Forest Service contends, and the district court held, that Great Old Broads failed to exhaust its challenge to the ROD.  We disagree.

The exhaustion doctrine serves "to permit administrative agencies to utilize their expertise, correct any mistakes, and avoid unnecessary judicial intervention in the process." *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010) (en banc) (citing *Buckingham v. U.S. Dep't of Agric.*, 603 F.3d 1073, 1080 (9th Cir. 2010)).  The APA requires that plaintiffs exhaust available administrative remedies before bringing grievances to federal court, 5 U.S.C. § 704, including the specific appeal procedures established by the Secretary before bringing an action in court against the Secretary of Agriculture.  7 U.S.C. § 6912(e); 36 C.F.R. § 215.  Plaintiffs need not frame issues in "precise legal formulations," so long as "the appeal, taken as a whole, provide[s] sufficient notice to the Forest Service to afford it the opportunity to rectify the violations that the plaintiffs alleged." *Native Ecosystems Council*, 304 F.3d at 899–900. When appellants object to a Forest Service decision, "claims raised at the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an

opportunity to consider and decide, the same claims now raised in federal court." *Id*. (quotation removed).

The Forest Service and the district court, when reviewing Great Old Broads's claims, considered only the appeal letter itself and not the attachments. The Appeal Deciding Officer did not consider the attached comment letters because the appeal letter did not explain which parts of which comments in the attached letters were relevant to each element of the appeal. But Forest Service regulations provide that attachments are a part of an appeal, *see* 36 C.F.R. § 215.15(a) ("Written appeals, including any attachments, must be filed"), and we have previously allowed judicial review of claims made in comment letters on a draft EIS when those comment letters were not even attached to formal appeals. *See Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 965 (9th Cir. 2006).

The district court mistakenly seems not to have recognized that Great Old Broads commented on the ROD at all. In ruling that Great Old Broads did not exhaust its administrative remedies, the district court found that "the attached comment letters address the draft EIS rather than the actual 2005 Decision." *Wilderness Soc'y*, 2011 WL 1042612, at *4. But one of the attachments, the letter of April 13, 2005, did address the ROD. That letter clearly asserted the three issues that were raised in the appellate briefing: (1) that the selected decision did not meet INFISH standards; (2) that keeping the road open offended Executive Order 11988 because it did not avoid the Jarbidge River floodplain; and (3) that the selected alternative, while an improvement, represented a "significant change that merits further environmental analysis," and that the decision "did not

provide a full analysis of the environmental impacts now being considered over time."

This was not a case where the agency was asked to piece together an appeal from a mountain of undifferentiated comment letters.  Great Old Broads attached its comment letters as distinct exhibits.  Any careful reviewer should have recognized that one of the seven addressed the ROD and should also have been able to see that the others gave added context for the appeal.  In the one letter addressing the ROD, Great Old Broads succinctly stated three legal objections. The appeal, taken as a whole, includes the attached comment letters.

The Forest Service argues that even if Great Old Broads's April 13 letter were properly considered as part of its appeal, the attachment was insufficient to exhaust Great Old Broads's claims under our recent decision in *Native Village of Kivalina IRA Council v. U.S. Environmental Protection Agency*, 687 F.3d 1216 (9th Cir. 2012), because Great Old Broads did not explain why it believed the ROD did not consider the claims made in its April 13 comment letter.  *See* 36 C.F.R. § 215.14(b)(8).  This argument contradicts *Great Basin Mine Watch* and misreads *Kivalina*.

In *Kivalina*, the Village of Kivalina petitioned for review of a National Pollutant Discharge Elimination System permit that allowed the discharge of wastewater from a mine into the Wulik River, which enters the Chukchi Sea near Kivalina. *Id.* at 1218.  The Environmental Appeals Board ("EAB") of the Environmental Protection Agency ("EPA") declined to review the permit, concluding that Kivalina "had not satisfied the procedural requirements to obtain review under 40 C.F.R. § 124.19(a) because it did not demonstrate why the [EPA's]

responses to comments were clearly erroneous or otherwise warranted review." *Id.* In denying Kivalina's petition, we noted that the EAB has consistently applied § 124.19(a) to deny review "where petitioners merely reiterate or attach comments previously submitted regarding a draft permit and do not engage the EPA's responses to those comments." *Id.* at 1220. This policy is similar to the Forest Service's appeal requirement that appellants demonstrate "[w]hy the appellant believes the Responsible Official's decision failed to consider the substantive comments." 36 C.F.R. § 215.14(b)(8). Because of this similarity, the Forest Service contends that our analysis in *Kivalina* controls here.

We reject the Forest Service's argument for several reasons. First, despite the facial similarity of the two standards, *Kivalina* arose in an entirely different legal context. The exhaustion of administrative remedies was not at issue in *Kivalina*. *See* 687 F.3d at 1218–22. Thus, *Kivalina*'s holding does not apply to the exhaustion issue here, although its reasoning may be considered to the extent persuasive on exhaustion. Instead of addressing an issue of exhaustion of administrative remedies, *Kivalina* reviewed the EAB's decision to decline to review the grant of an EPA permit. *Id.* We have consistently "defined the exhaustion requirement broadly," *Great Basin Mine Watch*, 456 F.3d at 965. But by contrast we held in *Kivalina* that the EAB's "power of review should be only sparingly exercised." 687 F.3d at 1219 (quotation removed). Unlike judicial review of agency actions under the APA, EAB review is only available to petitioners who have: (1) demonstrated that the challenged permit decision was clearly erroneous or (2) convinced the EAB to exercise its discretion to review the permit. *Id.* (quoting 40 C.F.R. § 124.19(a)). These different standards of review do not aid the Forest Service's argument

seeking to avoid review on the merits.  Because *Kivalina*
addressed a more restrictive threshold for review than that
faced by Great Old Broads, *Kivalina* does not control the
outcome here.

Second, although the two situations have some similarity,
and *Kivalina*'s reasoning is instructive, this reasoning tends
to support Great Old Broads's position on exhaustion, not that
of the government.  In *Kivalina*, the EAB refused to consider
Kivalina's challenge because Kivalina did not "engage the
EPA's responses to public comments."  *Id*. at 1221.  In its
decision to issue the permit, the EPA reproduced and
addressed several public comments, including comments by
Kivalina, on the monitoring provisions at issue.  *Id*. at
1220–22.  Rather than engaging with the EPA's responses to
comments and explaining why those responses did not answer
Kivalina's expressed concerns or justify the permitting
decision, Kivalina raised entirely new issues.  *See, e.g.*, *id*. at
1221.  Here, by contrast, the Forest Service did not
acknowledge or respond to Great Old Broads's April 13 letter
in the final EIS or the final ROD.  The final EIS answered
Great Old Broads's comments on the draft EIS, and the
Appeal Deciding Officer cited those responses when denying
Great Old Broads's administrative appeal.  But the only
indication that the Forest Service had considered the April 13
letter at all was the Forest Supervisor's conclusory statement
that he had "considered all views that have been expressed."

Where, as in *Kivalina*, an agency reproduces and responds
to comments, parties seeking review have a chance to bring
their own expertise to bear and explain why the agency's
responses to comments do not dispose of their complaints.
Even in the sparingly-exercised EAB review, petitioners are
only required to "engage the EPA's *responses* to [their]

20   GREAT OLD BROADS FOR WILDERNESS V. KIMBELL

comments." *Kivalina*, 687 F.3d at 1220 (emphasis added).
But here the Forest Service did not clearly respond to Great
Old Broads's comments in its April 13 letter, so the Forest
Service cannot reasonably require Great Old Broads to
explain why the "decision failed to consider th[ose]
substantive comments." *See* 36 C.F.R. § 215.14(b)(8).
Stated another way, when an agency clearly responds to
comments, it creates a rebuttable presumption that it has
considered and answered the commenter's concerns. To
overcome that presumption, the commenting party must
engage with those responses and at least say why they are
thought to be inadequate. If an agency does not respond,
however, appellants have nothing with which to engage.

To be presented on appeal, each of Great Old Broads's
three claims must have been exhausted before the Forest
Service. We first address Great Old Broads's contention that
the ROD violates the NFMA because it did not comply with
INFISH standard FW-2, which governs "fish and wildlife
interpretive and other user-enhancement facilities." In its
April 13 letter, Great Old Broads argued that the Selected
Alternative did "not meet the INFISH standards that are
incorporated into the [Humboldt Plan]." Great Old Broads
cited pages in the draft EIS that described FW-2 as "one
INFISH standard and guideline . . . that pertains to fish and
wildlife for the Jarbidge Canyon EIS." FW-2 is the first
standard listed under the first heading in the cited pages, and
its prominence put the Forest Service on notice that Great Old
Broads took issue with the ROD's compliance with FW-2.

Second, Great Old Broads contends that the ROD violates
EO 11988, which limits agency actions in floodplains. In the
same April 13 letter, Great Old Broads argued that the
decision "contravenes Executive Order 11988, because it

does not avoid the Jarbidge River floodplain."  EO 11988 is focused exclusively on preventing unnecessary development in floodplains and limiting the harmful effects of actions that must be sited in floodplains.  By citing EO 11988, Great Old Broads exhausted this claim.

Great Old Broads also exhausted its third claim, that the Forest Service violated NEPA by not preparing a supplemental EIS ("SEIS") for the Selected Alternative.  In its April 13 letter, Great Old Broads explained that the Selected Alternative, "while a major improvement over [draft EIS] Alternative 4, represent[ed] a significant change that merits further environmental analysis."  On this issue as with the preceding two, Great Old Broads's April 13 letter "allow[ed] the agency to give the issue meaningful consideration."  *Great Basin Mine Watch*, 456 F.3d at 971 (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004)).

We hold that the three claims presented on this appeal each were adequately exhausted by Great Old Broads's submissions to the Forest Service, and we reach the merits of Great Old Broads's appeal.

## B. Consideration of Claims on the Merits

Great Old Broads suggests three theories why the ROD was an arbitrary and capricious action by the Forest Service: (1) that the ROD violated the NFMA; (2) that the ROD violated EO 11988; and (3) that the ROD violated NEPA. The district court in its alternative holding granted summary judgment in favor of the Forest Service on all three theories, and we discuss each in turn.

## 1. The National Forest Management Act

The NFMA directs the Forest Service to develop a comprehensive land and resource management plan ("Forest Plan") for each unit in the national forest system. 16 U.S.C. § 1604(a). Forest Plans aim to balance environmental and economic concerns, while furthering the NFMA's purpose to "provide for diversity of plant and animal communities" in national forests. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012) (quoting 16 U.S.C. § 1604(g)(3)(B)). After a Forest Plan has been developed and implemented, the NFMA prohibits site-specific activities that are inconsistent with the governing Forest Plan. *Lands Council v. Powell*, 395 F.3d 1019, 1033 (9th Cir. 2005). The Forest Service's "interpretation and implementation of its own forest plan is entitled to substantial deference." *Native Ecosystems Council*, 697 F.3d at 1056; *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997) (An agency's interpretation of its own regulations is controlling unless "plainly erroneous or inconsistent with the regulation."). Great Old Broads contends that the ROD does not comply with the Humboldt Plan because it violates FW-2, one of INFISH's fish and wildlife restoration standards.

The Humboldt Plan governs the Forest Service's site-specific decisions in the Jarbidge Canyon. The Humboldt Plan was amended in 1995 by INFISH to give more protections for habitat and populations of resident native fish, including the bull trout. *See* Inland Native Fish Strategy: Decision Notice and Finding of No Significant Impact (1995) (INFISH 95); *see also* Inland Native Fish Strategy, 60 Fed. Reg. 39927, August 4, 1995. For watersheds occupied by inland native fish, INFISH supplies Riparian Management Objectives ("RMOs") that set goals for pool frequency,

density of large woody debris, bank stability, width-to-depth ratio, and water temperature. These categories identify characteristics of healthy fish habitat. INFISH does not require RMOs to be achieved as soon as they are announced; instead, they serve as benchmarks against which progress can be measured and degradation prevented.

For individual rivers, the Forest Service designates buffer zones around Riparian Habitat Conservation Areas ("RHCAs"). Parts of the South Canyon Road are in the Jarbidge River RHCA. To promote attainment of RMOs, INFISH sets standards and guidelines for activities inside these buffer zones, including road-building, mining, logging, and restoring fisheries and wildlife habitat. INFISH 95 A-6 to A-13. One standard, FW-2, requires the Forest Service to:

> Design, construct, and operate fish and wildlife interpretive and other user-enhancement facilities in a manner that does not retard or prevent attainment of the Riparian Management Objectives or adversely affect inland native fish. For existing fish and wildlife interpretive and other user-enhancement facilities inside Riparian Habitat Conservation Areas, assure that Riparian Management Objectives are met and adverse effects on inland native fish are avoided. Where Riparian Management Objectives cannot be met or adverse effects on inland native fish avoided, relocate or close such facilities.

INFISH 95 A-13.

Case 3:07-cv-00170-RLH-RAM Document 97 Filed 03/04/13 Page 24 of 33

24   Great Old Broads for Wilderness v. Kimbell
_____

Great Old Broads contends that several findings in the final EIS show that the ROD violates Fisheries and Wildlife Restoration standard FW-2, and therefore the Humboldt Plan and the NFMA.  In the final EIS, the Forest Service identified FW-2 as "one INFISH standard . . . that pertains to fish and wildlife for the Jarbidge Canyon EIS."  When analyzing each alternative in the final EIS, the Forest Service assessed whether it would or would not comply with FW-2 and described the effect each alternative would have on the RMOs.  The alternatives that were combined to form the Selected Alternative all had negative effects on RMOs.  Great Old Broads contends that these references to FW-2 in the final EIS show (1) that the standard applies to the road reconstruction and (2) that the ROD violates the standard, so the road must be "relocated or closed."[2]

We disagree.  The final EIS does indicate that FW-2 applies in the Project.  But even if FW-2 does apply to "fish and wildlife in the Jarbidge Canyon EIS," it requires action only for "fish and wildlife interpretive and other user-enhancement facilities."  The term "user enhancement facilities" does not appear to apply to roads but instead, as the Forest Service suggests, to trailhead facilities such as parking

_____

[2] Because we hold that FW-2 does not apply to road reconstruction, we do not reach Great Old Broads's second contention.  We note, however, that the ROD finds that the combined alternatives and the mitigation strategies in the Selected Alternative would not retard attainment of the RMOs under INFISH.  This finding, which is due substantial deference as the product of the Forest Service's technical expertise, *see Native Ecosystems Council*, 697 F.3d at 1056, could possibly prevent FW-2 from mandating the closure of the road even if it did apply to the road.

GREAT OLD BROADS FOR WILDERNESS V. KIMBELL   25

areas and toilets.[3]   By contrast, INFISH "Roads
Management" standards explicitly apply to the Jarbidge
Canyon Road.  INFISH 95 A-7 to A-8.  The final EIS
described these as the "standards and guidelines for road
management that pertain to the Jarbidge Canyon project," and
the ROD explained that the Selected Alternative complied
with INFISH by reference to Roads Management standards
RF-2 to RF-4. Like FW-2, the Roads Management standards
are concerned with attainment of RMOs.  They promote
attainment of RMOs by requiring various design
modifications and mitigation strategies, many of which were
included in the ROD.  Unlike FW-2, the Roads Management
standards do not require that roads be relocated or closed
unless the roads are obsolete.

The text of related INFISH standards also guides against
reading "user-enhancement facilities" to include roads.  The
introduction to the collected standards and the Minerals
Management standard MM-2 include both "roads" and
"facilities" on lists, showing that INFISH considered
"facilities" and "roads" to be distinct categories.  INFISH 95
A-6, A-10.  There is no evidence in the final EIS that FW-2
applies beyond what its plain language indicates.

We will defer to the Forest Service's interpretation of
FW-2 unless it is plainly erroneous or inconsistent with the
standard.  *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*,
565 F.3d 545, 557 (9th Cir. 2009).  It is neither.  We hold that
the Forest Service's interpretation of FW-2 is reasonable and
that the ROD does not violate the NFMA.

---

[3] The Selected Alternative removed toilets at Urdahl and Snowslide
Gulch, as FW-2 would require.

26   GREAT OLD BROADS FOR WILDERNESS V. KIMBELL

## 2. Executive Order 11988: Floodplain Management

EO 11988 calls on "federal agencies taking action 'in or affecting a floodplain' to think twice." *Carmel-By-The-Sea*, 123 F.3d at 1166.  This executive order discourages unnecessary development in floodplains.  Agencies must avoid siting actions in floodplains unless the head of the agency finds there is no practicable alternative.  42 Fed. Reg. 26951 § 2(a)(2) (1977).  If there is no practicable alternative, the agency must "(i) design or modify its action in order to minimize potential harm to or within the flood plain," and "(ii) prepare and circulate a notice containing an explanation of why the action is proposed to be located in the flood plain."  *Id.*  We will set aside agency findings under EO 11988 only if they are arbitrary, capricious, or an abuse of discretion.  *Carmel-By-The-Sea*, 123 F.3d at 1166.

Great Old Broads contends that the Forest Service did not comply with any of EO 11988's three requirements, beginning with the fact that it made no formal finding that there was no practicable alternative to siting the road in the Jarbidge Canyon floodplain.  But the South Canyon Road had been sited in the floodplain for years before the area was added to the national forest system—long before EO 11988 was contemplated.  Great Old Broads claims that this appeal to the status quo is a prohibited post-hoc argument.  But the final EIS explained that the proposed action was "to authorize the reestablishment of the South Canyon Road," and the Forest Service characterized the preexisting road, situated in the floodplain, as the no-action alternative in the final EIS and the ROD.  Great Old Broads has not challenged those characterizations and provides no authority showing that EO 11988 requires the relocation of existing roads that require restoration or improvement.  Longstanding custom and usage

of a community is not irrelevant to a sensible application of environmental law.  In considering options for the South Canyon Road, the Forest Service was not siting a new project but was crafting the next "phase in an essentially continuous activity."  *See Sierra Club v. Hassell*, 636 F.2d 1095, 1099 (5th Cir. 1981) (quoting *City & County of San Francisco v. United States*, 615 F.2d 498, 501 (9th Cir. 1980)).  The Forest Service was entitled to rely on the established location of the South Canyon Road to comply with this first element of EO 11988.

EO 11988 separately requires that agencies "prepare and circulate a notice containing an explanation of why the action is proposed to be located in the floodplain."  42 Fed. Reg. 26951 § 2(a)(2).  This notice should be included in the agency's NEPA statement.  *Id*.  § 2(a)(1).  As Great Old Broads admits, this notice requirement is "closely related" to the requirement that the agency make a finding of no practicable alternative.  Where the latter has been fulfilled, courts have not found the former to be insufficient.  *See e.g.*, *Carmel-by-the-Sea*, 123 F.3d at 1166; *Hassell*, 636 F.3d at 1100.  In addition to the indicators discussed above that show the Forest Service complied with the requirement that it make a finding of impracticability, the Forest Service advised readers in the final EIS that it was considering the commands of EO 11988, and the final EIS explicitly analyzed two out-of-floodplain alternatives.  This was sufficient notice.

Finally, EO 11988 requires an agency taking action in a floodplain to "design or modify its action in order to minimize potential harm to or within the floodplain." 42 Fed. Reg. 26951 § 2(a)(2).  In forming the Selected Alternative, the Forest Service took elements from Alternatives 1, 3, and 4 and modified the combination to minimize the road's

impact on the floodplain. These modifications included: (1) Replacing the upper part of the road with a hiking trail to ameliorate mass wasting, which provided for "road reclamation in the most unstable portion of the canyon bottom." (2) Choosing not to widen or realign the road, which "decrease[d] the amount of sediment entering the river over time" and avoided the "increased erosion noted for other road alternatives." (3) Replacing proposed structures in Alternatives 3 and 4 with low-water crossings. The proposed structures would have "impede[d] flow during high-water events" and prevented the "pass-through of debris from large flows."

Great Old Broads contends these modifications were not enough because EO 11988 requires an agency to "modify its action in order to minimize potential harm to or within the floodplain." *Id*. § 2(a)(2). Great Old Broads argues that "minimize" means the Forest Service must reduce potential harm to "the smallest quantity, number, or degree possible or permissible." Webster's New Twentieth Century Dictionary 1145 (2d ed.). But when we have considered the word "minimize" in similar contexts, we have held any mitigation only needs to be reasonable. The Department of Transportation Act of 1970 mandates that all measures "technically possible . . . be implemented" to "minimize harm" to public parks. 49 U.S.C. § 1653(f)(2). We held that "implied within the statement 'all measures,' is the condition that such efforts to minimize harm be feasible and prudent, or reasonable." *Adler v. Lewis*, 675 F.2d 1085, 1094 (9th Cir. 1982). This understanding of "minimize" parallels the definition of "practicable" that we have used when reviewing actions under EO 11988. In *Carmel-by-the-Sea*, we understood "practicable" to mean: "capable of being done within reasonable natural, social, or economic constraints."

GREAT OLD BROADS FOR WILDERNESS v. KIMBELL   29

123 F.3d at 1166 n.20 (quoting 23 C.F.R. § 650.105(k)).  In applying EO 11988, the D.C. Circuit held that the National Park Service fulfilled its obligation to minimize impacts when it "affirmatively required design changes to ameliorate adverse effects on the floodplain."  *Daingerfield Island Protective Soc. v. Babbitt*, 40 F.3d 442, 447 (D.C. Cir. 1994).  The D.C. Circuit did not analyze the degree to which those modifications would ameliorate any adverse affects.  *Id.*

The changes the Forest Service made in finalizing the Selected Alternative possibly do not limit the floodplain impacts of the ROD to the smallest degree possible, but they were reasonable, affirmatively-required design changes that the Forest Service determined would ameliorate adverse effects on the floodplain.  We will not second-guess that determination.  The Forest Service's actions were not arbitrary or capricious under EO 11988.

### 3. National Environmental Policy Act

Great Old Broads contends that "combining Alternatives 1, 3, and 4 dramatically changed their environmental impacts, [so] the Forest Service violated NEPA by failing to prepare a supplemental EIS (SEIS)."  We review the Forest Service's decision not to prepare an SEIS under the arbitrary or capricious standard.  *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1044 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 2439 (2012).  We review *de novo* the district court's grant of summary judgment that no SEIS was required.  *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 556 (9th Cir. 2000).  We affirm.

Under NEPA, an agency must prepare an EIS for any proposed federal action "significantly affecting the quality of

the human environment." 42 U.S.C. § 4332(2)(C).  The EIS must consider "the environmental impact of the proposed action" and "any adverse environmental effects which cannot be avoided should the proposal be implemented."  *Id.* § 4332(2)(C)(i)–(ii).  The range of relevant effects is broad, and the EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). By requiring this evaluation before a project is finalized, "NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct."  *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 371 (1989).

An agency "must have some flexibility to modify alternatives canvassed in the draft EIS to reflect public input."  *California v. Block*, 690 F.2d 753, 771 (9th Cir. 1982).  But if after this process, an "agency makes substantial changes in the proposed action that are relevant to environmental concerns," the agency must prepare an SEIS. 40 C.F.R. § 1502.9(c).  In considering the terms "substantial changes" and "environmental concerns," we have adopted the Council for Environmental Quality's ("CEQ") guidance that "supplementation is not required when two requirements are satisfied: (1) the new alternative is a '*minor variation* of one of the alternatives discussed in the draft EIS,' and (2) the new alternative is '*qualitatively within the spectrum of alternatives* that were discussed in the draft [EIS].'"  *Russell Country Sportsmen*, 668 F.3d at 1045 (emphasis added in *Russell Country Sportsmen*) (quoting Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,035 (Mar. 23, 1981)).

Great Old Broads points to no specific changes that it deems not adequately analyzed in the final EIS.  Instead,

Great Old Broads relies on the First Circuit's decision in *Dubois v. U.S. Department of Agriculture* to argue that an SEIS is required whenever a proposed project constitutes "a different configuration" of previously analyzed elements. 102 F.3d 1273, 1291–93 (1st Cir. 1996). In *Dubois*, the Forest Service published an EIS analyzing the effects of a proposed ski resort. *Id.* at 1278. The preferred alternative adapted an analyzed alternative to a smaller parcel of land, eliminating woodland buffer zones between ski trails and proposing an unanalyzed "28,500-square-foot base lodge facility within the existing permit area." *Id*. at 1292. The First Circuit held that these were "substantial changes from the previously-discussed alternatives, not mere modifications 'within the spectrum' of those prior alternatives." *Id.*

Here, by contrast, the Selected Alternative is primarily made of elements from Alternatives 1, 3, and 4 that were analyzed—as elements—in the final EIS. From that analysis, the Forest Service and the public could assess the cumulative effect of these elements, and the Forest Service could reasonably determine that the combination was "within the spectrum" of previously analyzed alternatives.

In addition to these elements, the Selected Decision incorporated several mitigating modifications. Most, such as (1) minimizing the number of river crossings by heavy equipment during construction, (2) clearly marking low-water crossings and posting them with 5 MPH speed limits, and (3) removing toilets at Snowslide Gulch and Urdahl, were "minor variation[s] of one of the alternatives discussed in the draft EIS." *See Russell Country Sportsmen*, 668 F.3d at 1045 (internal quotation omitted). Another modification changed the targeted "design vehicle" from a passenger car to a four-wheel-drive vehicle. The "design vehicle" is the type of

vehicle that the road is designed to accommodate, so this change lowered the construction and maintenance costs for the road and limited the amount of traffic the road is likely to bear. Although this change is not identified as an element from one of the analyzed alternatives, only a four-wheel-drive vehicle could use the road as it was at the time of the final EIS, so the reduction in service level brought the Selected Alternative in line with Alternative 1—the no-action alternative.

Great Old Broads alternatively contends that even if the Forest Service correctly decided that an SEIS was not required, it violated NEPA because it did not adequately document that determination in the record. An agency must make a reasoned decision whether an SEIS is required, *see Friends of the Clearwater*, 222 F.3d at 557, and the Forest Service often presents this threshold determination in a supplemental information report ("SIR"). *See* Forest Service Handbook 1909.15, ch. 10 §§ 18.1-18.2. Here the Forest Service did not prepare a separate SIR, but it did make a reasoned decision, documented in the record, that an SEIS was not warranted.

An agency must document its decision that no SEIS is required to ensure that it remains "alert to new information that may alter the results of its original environmental analysis, and continue[s] to take a 'hard look at the environmental effects of [its] planned action, even after a proposal has received initial approval.'" *Friends of the Clearwater*, 222 F.3d at 557 (quoting *Marsh*, 490 U.S. at 374). In *Friends of the Clearwater*, appellants challenged a timber sale in the Nez Perce National Forest for which they claimed the environmental analysis was inadequate. *Id.* at 554. The Forest Service completed a programmatic EIS for

GREAT OLD BROADS FOR WILDERNESS V. KIMBELL   33

the entire National Forest in 1987 and a site-specific EIS for several timber sales in 1989. *Id.* at 554–55. In 1996, the last two of those sales were awarded. *Id.* at 555. When challenging those sales, appellants explained that the project's EIS did not consider the designation of sensitive tree species in the ten years since the Forest Service completed the site-specific EIS. *Id.* Those designations, appellants contended, "constituted significant new information that should be considered in an SEIS." *Id.* at 555–56.

We faulted the Forest Service because there was "no evidence in the record that . . . the Forest Service ever considered whether the seven new sensitive [tree] species designations . . . were sufficiently significant to require preparation of an SEIS." *Id.* at 558. By contrast, Great Old Broads points to no new information that was not considered in the final EIS, and the Forest Supervisor explained in the ROD that he "determined that the Selected Alternative was fully analyzed in Chapter 3 of the [final EIS]." This was adequate documentation of the Forest Service's reasoned decision that no SEIS was required.

## IV.  CONCLUSION

We hold that Great Old Broads exhausted its claims before the Forest Service but that the ROD conforms to the NFMA, EO 11988, and NEPA. We reverse the district court on its analysis of exhaustion, but we affirm the district court on its alternate decision on the merits as to each of the claims presented. The parties shall bear their own costs.

**REVERSED ON EXHAUSTION and AFFIRMED ON THE MERITS**.